25-mj-1017-DLC

## AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT

I, Nicholas D. Precourt, being duly sworn, depose and state as follows:

### Agent Background

1. I am a "federal law enforcement officer" within the meaning of Federal Rule of Criminal Procedure 41(a)(2)(C), that is, a government agent engaged in enforcing the criminal laws and duly authorized by the Attorney General to request a search warrant.

2. I am a Detective with the Norton Police Department, where I have worked since 2009. Since August 2023, I have been assigned to the Drug Enforcement Administration ("DEA") New Bedford Resident Office ("NBRO") as a Task Force Officer ("TFO"). I am a graduate of the Plymouth Police Academy and have attended training classes related to the illegal distribution of narcotics, including DEA Basic Narcotics School, Street Level Narcotics School, Meaningless Ride Seminar, Combating Heroin Seminar, and Cultivating Confidential Informants.

3. Throughout my career, I have conducted or participated in the arrest of narcotics offenders, controlled purchases of narcotics, and drug-related surveillance. I have been the case detective on undercover operations in which an undercover police officer purchased illegal narcotics. I have been the affiant for search warrants for places where narcotics, narcotic paraphernalia, and United States currency were located. Through my training and experience, I have observed numerous types of controlled substances and am familiar with the paraphernalia associated with the distribution and use of these substances, the ways in which they are commonly packaged, the prices charged for them, and the jargon associated with their sale and use.

4. Based on my training and experience, I am also familiar with narcotics traffickers' methods of operation, including methods used to distribute, store, and transport narcotics, and to collect, expend, account for, transport, and launder drug proceeds.

5.      Since July 2024, I have been investigating Candelario ESPINO, Joamme GONZALEZ, Oliver Jose ORTEGA Lopez, and Randy MAZIN and others known and as yet unidentified (the "Target Subjects") for violations of 21 U.S.C. §§ 841 and 846 (distribution of controlled substances and conspiracy to commit same) (collectively, the "Target Offenses").

6.      I am familiar with the facts and circumstances of this investigation, and I have received information from a variety of sources, including but not limited to other law enforcement officers and agents, confidential sources of information, physical and electronic surveillance, drug seizures, and my personal review of records relating to the investigation.

## Purposes of the Affidavit

7.      I submit this affidavit in support of an application for a criminal complaint charging MAZIN with one count of conspiracy to distribute and to possess with intent to distribute controlled substances, in violation of 21 U.S.C. § 846 (the "Charged Offense"). Based on the facts in this affidavit, there is probable cause to believe that MAZIN has committed the Charged Offense.

8.      As a result of my personal participation in the investigation, review of reports submitted by other law enforcement personnel, and my consultations with other law enforcement officers, I am familiar with this investigation. The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. I submit this affidavit for the limited purpose of establishing probable cause for the requested criminal complaint and warrants. Accordingly, I have not included each and every fact known to me and other law enforcement officers involved in this investigation.

9.      All times are approximate.

25-mj-1017-DLC

## Probable Cause

### Background

10.     On August 2, 2024, DEA executed a state search warrant at the home of a person ("CD") who they were investigating for drug trafficking.[1] On that day, CD informed investigators that s/he was going to pick up one pound of crystal methamphetamine from a source saved in his/her phone under the name "Trust." Investigators later determined that Trust is ESPINO.

11.     CD explained that s/he typically would contact ESPINO via the Signal messaging application ("Signal") and tell ESPINO what s/he would want to buy, and ESPINO would direct CD to a location in Boston at which either ESPINO or a courier would sell the drugs to CD. Based on experience and training, investigators know that Signal is a communication application which uses end-to-end encryption, similar to WhatsApp or Telegram. Investigators further believe that drug traffickers commonly use these types of end-to-end encrypted applications to shield their communications from law enforcement detection.

12.     Using the Signal messages from CD's phone, investigators identified ESPINO's telephone number and iCloud account and, in November 2024 and January 2025, obtained federal search warrants for historical information for that iCloud account (the "November 2024 Warrant and the January 2025 Warrant."). Through surveillance and other federally approved search and

---

[1] On August 2, 2024, CD was in a cooperative posture, but s/he subsequently stopped cooperating. In connection with the execution of the warrant, CD was arraigned in Bristol Superior Court on charges of trafficking controlled substances, distribution of and possession with intent to distribute cocaine, and unauthorized possession of ammunition. CD's criminal history includes arrests and convictions for domestic violence, failure to appear, assault with a dangerous weapon, breaking and entering, and driving under the influence. Information provided by CD was corroborated to the extent possible, led to the seizure of narcotics, and is believed to be reliable.

tracking warrants, investigators learned about locations that were significant to ESPINO's drug trafficking activity. As described below, one of those locations was 6 Hillside Avenue in Chelsea, Massachusetts, which is MAZIN's address.

**June 6, 2024: ESPINO directed the delivery of narcotics to MAZIN's address for resale.**

13. Based on iMessages obtained pursuant to the November 2024 iCloud Warrant that were exchanged between, between ESPINO and ORTEGA on June 6 and 7, 2024, I believe that ESPINO knowingly directed ORTEGA to give drugs to MAZIN.

14. Specifically, I believe that, in lightly coded language, ORTEGA complained about the drugs he got from ESPINO, and ESPINO agreed to "take back" what he had sold to ORTEGA. ESPINO then directed ORTEGA to return the drugs to "6 hillside ave." MAZIN's address is 6 Hillside Avenue, Chelsea, Massachusetts. Later that day, ORTEGA told ESPINO he got $400 for the drugs from the person, who I believe was MAZIN. Finally, ESPINO told ORTEGA that the person (MAZIN) sold the returned drugs to his own customers.

15. Based on my training, experience, these messages, and other information gathered though his investigation, I believe that ESPINO had a continuous agreement to supply controlled substances to ORTEGA for resale, and that MAZIN eventually sold the drugs that ORTEGA dropped off at that location to MAZIN's customers.

**August 2024: Investigators identified ESPINO as a narcotics dealer.**

16. Investigators obtained messages exchanged between CD and ESPINO between May 30, 2024, and August 2, 2024. In those communications, ESPINO, among other things, in lightly coded language, discussed his ability to provide CD with "tea," "tee," and "t," which I know to be methamphetamine, "c," meaning cocaine, "Downstairs," which is a street name for fentanyl, and "Blues," which I know to refer to counterfeit oxycodone pills containing fentanyl.

**November 19, 2024: ESPINO referenced MAZIN while negotiating a drug transaction.**

20.     iMessages obtained pursuant to the January 2025 iCloud Warrant show that, on November 18 and 19, 2024, ESPINO exchanged messages with a person ("JC") who investigators believe is a dealer who sources drugs from ESPINO. Such messages show that ESPINO, in coded language, discussed a transaction of three ounces of suspected methamphetamine for $1,050 with JC. ESPINO quoted a price of "4 for 1300 or 3 for 1150" before correcting the price to "3" for "1050." Based on my training and experience and knowledge of this investigation, I believe that ESPINO was negotiating a sale of crystal methamphetamine for resale rather than for personal use.

21.     In the messages, JC asked ESPINO why the price was so high. ESPINO advised her to ask "Randy." Based on my training and experience, and information obtained through this investigation, as explained in more detail below, I believe that Randy is MAZIN.

**December 18, 2024: ESPINO engaged in a series of suspected drug-related transactions while travelling between the areas of his home, MAZIN's home, and ORTEGA's home.**

22.     Based on information obtained during this investigation, investigators believe that, on December 18, 2024, ESPINO went to MAZIN's address, and other places, to collect proceeds to buy drugs for resale.

23.     At 12:28 p.m., ESPINO began exchanging messages with ORTEGA. ESPINO told ORTEGA that he needed to see him, and ORTEGA replied that he had ESPINO's money. ESPINO told ORTEGA he had run out of drugs before clarifying that he had a "qp left." Based on my training and experience, I know that "qp" refers to a quarter pound of drugs, typically methamphetamine. ESPINO then asked ORTEGA if he could come to Chelsea. When ORTEGA replied he was in an Uber, and ESPINO told him not to come to Chelsea.

24.     After a brief stop at a Burger King, ESPINO drove to the area of MAZIN's address,

arriving at 12:50 p.m. At 12:57 p.m., investigators saw ESPINO exit the building located at MAZIN's address. ESPINO left the area at 1:00 p.m. Based on my training and experience, and information gathered during this investigation, including messages in which I believe that ESPINO told someone he was collecting drug proceeds, that ESPINO was not able to get cash from ATM machines, and that ESPINO stayed in the area of MAZIN's address. for only seven minutes, I believe ESPINO collected drug proceeds from MAZIN at his apartment.

25.    ESPINO then drove the Jeep directly to the area of ORTEGA's residence, in Lynn, arriving at 1:20 p.m. At that time, ESPINO messaged ORTEGA that he was "out back." Based on my training and experience, my knowledge from the investigation that ESPINO had told ORTEGA that he had only a quarter pound of drugs and that ESPINO was not able to get cash from ATM machines, and messages showing that ESPINO told someone at 11:37 a.m. that he was collecting drug proceeds, I believe ESPINO collected drug proceeds from ORTEGA that day.

26.    Investigators believe, based on iMessages obtained pursuant to the January 2025 iCloud Warrant, that after ESPINO stopped a MAZIN's and ORTEGA's addresses, ESPINO negotiated with a source to buy drugs for $1,300 each. In those iMessages, ESPINO stated that he would need a half hour to his home and that he was was "[p]icking up the cash."

27.    Later that evening, ESPINO traveled directly to the area of MAZIN's address, arriving at 7:55 p.m. Based on my training and experience and belief that ESPINO had recently bought drugs, I believe that ESPINO went to MAZIN's residence to deliver the drugs for resale.

28.    In sum, based on my training, experience, and the information collected over the course of this investigation, I believe that, between the late morning of December 18, 2024, and the early morning of December 19, 2024, ESPINO travelled between his home, MAZIN's address, and ORTEGA's home to pick up drugs to sell to customers, collect drug proceeds, and to obtain

more drugs to sell. I believe he used the proceeds collected from MAZIN and ORTEGA to buy more drugs, which he delivered to MAZIN later that night for resale.

**Between December 19, 2024, and January 2, 2025, when ESPINO was out of the country, ESPINO directed a courier to deliver drugs to MAZIN and ORTEGA.**

29. On December 22, 2024, based on iMessages obtained by investigators through the January 2025 iCloud Warrant, investigators believe that ESPINO directed an unidentified person ("UP1"), to collect drug proceeds at MAZIN's address.

   a. First, ESPINO messaged UP1, "Also Chelsea got cash for me u can scoop." Based on my training and experience, I believe that ESPINO asked UP1 in coded language to pick up drug proceeds from MAZIN at 6 Hillside Avenue.

   b. Later, UP1 replied, and ESPINO messaged UP1, "Chelsea be home by 6." Based on my training and experience, I believe ESPINO meant, in coded language, that MAZIN would be home (6 Hillside Avenue) by 6 p.m.

   c. UP1 then messaged with ESPINO about collecting money from a person whose name started with "A." Later that day (December 22, 2024), UP1 messaged ESPINO, "Yo broski he said 7 so set that up wit Chelsea so i can slide over there at 6 then head straight to A." I believe that UP1 was asking ESPINO to let MAZIN know that UP1 would be at 6 Hillside Avenue in Chelsea at 6 p.m. to pick up drug proceeds and then head over to another place, where the person whose name began with A would be.

30. On December 26, 2024, based on iMessages obtained pursuant to the January 2025 iCloud warrant, investigators believe ESPINO, in coded language that included referring to MAZIN as "Chelsea," directed UP1 to drop off drugs and pick up money from MAZIN's address.

   a. ESPINO messaged UP1, "Yo manito whenever u can see Chelsea lmk he got bread and need a q." I believe that in those messages, ESPINO was telling UP1 that Chelsea (MAZIN) had money for a quarter pound of drugs and that UP1 should go to 6 Hillside Avenue, to deliver drugs and pick up money.

   b. At 4:12 p.m., ESPINO told UP1, "Aight Malden ready," which I believe meant that a customer in Malden was ready. UP responded, "bet Randy to?", which I believe meant that UP1 was saying that MAZIN, whose first name is Randy, was also ready for UP1 to come by to drop off drugs and pick up money. At 4:20 p.m., ESPINO directed UP1, "Randy q," which I believe was ESPINO telling UP1 to deliver a quarter pound of drugs to MAZIN.

 c. At 6:27 p.m., UP1 messaged ESPINO, "im out here" and "no open," which I believe meant that UP1 was telling ESPINO he was at MAZIN's residence and MAZIN was not opening the door. I believe UP1 was referring to 6 Hillside Avenue, because in the next set of messages, still at 6:27 p.m. on December 26, 2024, ESPINO told UP1, "U just gotta go down cus he don't answer." I believe that ESPINO was telling UP1 that he needed to go to the basement apartment of 6 Hillside Avenue because MAZIN would not answer if UP1 went to front door.

 d. Then, UP messaged ESPINO that he did not see MAZIN's pickup truck at the residence. Investigators believe that MAZIN drives his mother's pickup truck. ESPINO responded to UP that MAZIN was at Home Depot down the street at the checkout counter."

31. On December 27, 2024, based on iMessages obtained pursuant to the January 2025 iCloud Warrant, investigators believe that ESPINO asked UP1 to deliver drugs to and collect drug proceeds from MAZIN:

 a. At 4:56 p.m., ESPINO messaged UP1, "Manito randy hit me for whenever no rush, lmk what he gave u yesterday." Based on my training and experience, I believe that ESPINO was telling UP1 that MAZIN asked ESPINO for more drugs and ESPINO wanted to know what MAZIN gave UP1 the day before as far as money.

 b. UP1 replied, "ya what he nupded ima have to break the pie down." I believe that UP1 was asking ESPINO what quantity of drugs MAZIN wanted so UP would know how to portion it. UP1 also messaged, "he gave me 9 yesterday," which I believe meant that MAZIN gave UP $900 the day before.

 c. At 4:38 p.m., UP1 asked ESPINO, "what am i taking him?" and "q?", to which ESPINO responded, "Yezzir." Based on the price ($900), I believe that ESPINO directed UP1 to deliver a quarter pound of methamphetamine to MAZIN.

### January 6, 2025: Law enforcement responded to a suspected overdose at MAZIN's residence.

32. On January 6, 2025, just after 5:00 a.m., the Chelsea Police Department responded to a report of an unresponsive party at MAZIN's address. Officers entered the basement apartment of the building at that address, where they encountered MAZIN, who law enforcement described as "living in the apartment." MAZIN was with JC, with whom ESPINO had exchanged coded,

drug-related iMessages in November 2024, as well as a third party, who was unconscious.

**January 16, 2025: Trash from MAZIN's address contained drug residue.**

33. On January 16, 2025, two employees of the Chelsea Department of Public Works, at the direction of investigators, removed five trash bags from a trash can located on the curb in front of MAZIN's address. Investigators followed the employees to the Chelsea Police Department, where they searched the bags.

34. In one bag, investigators found a plastic bag with white residue and mail addressed to MAZIN at MAZIN's address. Among other items, investigators also found a food delivery receipt for a "Randy M." with directions to leave food at MAZIN's address in "Basement, door is down in yard." In another bag, investigators found a plastic bag with white residue and a small amount of a white, crystal-like substance. A field test for that substance was positive for methamphetamine.

**February 13, 2025: DEA seized firearms and suspected narcotics packaged for sale during the execution of a federal search warrant at MAZIN's residence.**

35. On February 12, 2025, the Honorable Paul G. Levenson, United States Magistrate Judge, District of Massachusetts, authorized a search warrant allowing law enforcement to search the basement apartment of MAZIN's address. *See* 24-mj-1014-DLC. The warrant authorized law enforcement to seize, among other things, any evidence, fruits, and instrumentalities of violations of 21 U.S.C. § 841(a)(1) (possession with intent to distribute or distribution of controlled substances) and 21 U.S.C. § 846 (conspiracy to commit the same).

36. On February 12, 2025, starting at approximately 6:00 a.m., DEA, with the assistance of other agencies, executed the search warrant for the basement apartment at MAZIN's address. After knocking on the rear door and announcing their presence, law enforcement breached

the door after a reasonable amount of time.

37. When the officers entered the apartment, they encountered MAZIN sleeping in a bed that was suspended in air (over a couch). Law enforcement observed that the apartment consisted of one bedroom/living room, one bathroom, a closet, a little kitchen area, and a workshop area. The apartment was very cluttered, with suspected narcotics, the majority of which were packaged in glassine baggies, and drug paraphernalia scattered around the living room/bedroom area. Some of the suspected drugs were clear in color, consistent with crystal methamphetamine, while others were yellow, which investigators believe may be ketamine.

38. On a table in the bedroom/living room area was a red Solo cup containing a crystal-like substance that, in my training and experience, appeared to be crystal methamphetamine. There was also a small glassine bag containing a similar substance.

39. To the right of the table, there was a bathroom. Past the bathroom, there was a shelf. On the shelf was a gray box. Inside the box were bags of a crystal, rock-like substance that in my training and experience, appeared to be crystal methamphetamine. Inside the same box were numerous, unused, glassine bags that, in my training and experience, I believe are used by drug dealers to package drugs for sale.

40. To the right of the shelf was a closet. Inside the closet, was what appeared to law enforcement as an AR-15 style rifle. The lower half and the upper half were disassembled. In that same closet was a small, black safe. Inside the safe was a black handgun.

41. On the wall, opposite the table mentioned above, there was a plastic bag containing a white, powdery substance. Next to that bag, was a bag containing a brown substance, also believed to be ketamine.

42. Based on the information obtained through this investigation, I believe that MAZIN lives in this apartment and had access to everything in it.

  

*Left: Solo Cup on Table With Crystal Substance*
*Middle: Safe with Firearm*
*Right: Plastic Glassine Bags*

### Conclusion

43. I submit that there is probable cause to believe that in and around June 2, 2024, to February 13, 2025, MAZIN engaged with ESPINO, ORTEGA, and others, known and unknown, in a conspiracy to distribute and to possess with intent to distribute controlled substances, in violation of 21 U.S.C. § 846.

Respectfully submitted,

Nicholas D. Precourt, Task Force Officer
Drug Enforcement Administration

Sworn via telephone in accordance with Fed R. Crim. P. 4.1 on February 13, 2025

Honorable Donald L. Cabell
United States Magistrate Judge